UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SANDRA VASQUEZ,

                    :

            Plaintiff,

                    :           16 Civ. 6707 (AJP)

      -against-

                    :       **OPINION & ORDER**

NANCY A. BERRYHILL, Acting Commissioner of
Social Security,

                    :

            Defendant.        :

                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Sandra Vasquez brings this action pursuant to § 205(g) of the Social Security

Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security

denying her application for Supplemental Security Income and Disability Insurance Benefits. (Dkt.

No. 1: Compl.) The parties have consented to decision of the case by a Magistrate Judge pursuant

to 28 U.S.C. § 636(c). (Dkt. No. 18.) Presently before the Court are the parties' cross-motions for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 12: Vasquez Notice of Mot.;

Dkt. No. 14: Comm'r Notice of Mot.)

        For the reasons set forth below, Vasquez's motion for judgment on the pleadings

(Dkt. No. 12) is <u>DENIED</u>, and the Commissioner's motion (Dkt. No. 14) is <u>GRANTED</u>.

**FACTS**

**<u>Procedural Background</u>**

        On September 30, 2013, Vasquez filed for Disability Insurance Benefits ("DIB")

alleging an inability to work due to disability since March 1, 2012, and Supplemental Security

Income ("SSI") alleging disability since January 1, 2013. (Dkt. No. 11: Admin. Record filed by

Comm'r ("R.") 203-16.)  On December 5, 2013, the Social Security Administration found Vasquez not disabled.  (R. 114-30.)  On January 9, 2014, Vasquez requested an administrative hearing.  (R. 132-34.)  Administrative Law Judge ("ALJ") Sheila Walters conducted a hearing on June 16, 2015 (R. 42-76), at which Vasquez appeared with attorney David Levine (R. 42-44, 201).  On August 13, 2015, ALJ Walters issued a written decision finding Vasquez not disabled.  (R. 9-24.)  ALJ Walters' decision became the Commissioner's final decision when the Appeals Council denied Vasquez's request for review on July 22, 2016.  (R. 1-5.)

**<u>Non-Medical Evidence & Testimony</u>**

Vasquez was born on May 24, 1975, and was thirty-six years old at the time of her alleged disability onset on March 1, 2012.  (R. 203.)  Vasquez's allegedly disabling conditions include chronic depression, bipolar disorder, anxiety, migraines, obesity, asthma, panic attacks and schizophrenia.  (R. 237, 267, 309.)  At the time of her hearing before ALJ Walters, Vasquez lived in the Bronx with her three children, ages nineteen, twenty, and twenty-three.  (R. 49.)  Vasquez completed eleventh grade, but did not obtain a GED, attend college or receive any vocational training.  (R. 50.)  Vasquez was self employed for several years as a babysitter in her own home, and as a home attendant at Loretto Utica Adult Residence, but stopped working due to her depression. (R. 53-55, 69, 238, 254, 267-68, 360.)

Vasquez relied on her children or friends to assist with her personal grooming, laundry, grocery shopping, and household chores, as well as to transport her to various appointments.  (R. 49-50, 52-53, 246-47, 284-86, 311.)  Vasquez claimed she had no energy to dress or bathe due to her depression, although she was able to prepare simple meals three or more times a week.  (R. 244-45, 283-84, 311.)  When Vasquez had no energy to cook, her children would prepare her meals.  (R. 52, 284-85.)  Vasquez testified that she had no hobbies or activities, belonged

to no organizations such as a church or club, watched no television and spent no time with other people, although she denied having problems getting along with family members and friends.  (R. 53, 60-61, 248, 313-14.)[1]

Vasquez went outside at least once a month and was able to use public transportation. (R. 246, 285, 312.)  Vasquez testified that she could not stand crowds or strangers, and handled stress by taking pills every day and staying in her bedroom alone with the door closed (R. 61, 67) "sleeping all day" (R. 283).  Memory problems caused Vasquez to "forg[e]t many things" (R. 60, 251, 290), and her poor concentration and inability to read made it difficult to handle her finances (R. 247, 250-51, 286, 289), although her ability to do so improved by early 2014 (see R. 312).[2]

Vasquez testified that her arthritis in both knees limited her to thirty minutes of walking at a time, two or three times during an eight-hour work day, and twenty minutes of sitting at a time before she would have to lie down.  (R. 59-60, 288.)[3]  Vasquez could lift one gallon of milk, but not two, and denied any problems using her hands.  (R. 60, 249, 288.)  Vasquez further

---

[1]    Vasquez's January 18, 2013 self-report states that she watches television once a week, goes to church once a week "at times" and had problems getting along with authority figures, which caused her to twice lose her job.  (R. 247-48, 250.)  Her October 10, 2013 self-report states that she "like[s] to watch tv . . . every day," went shopping twice a month for two hours at a time, and reiterates her problems with authority figures and job loss as a result. (R. 286, 289.)  Vasquez's January 23, 2014 third-party function report states that she "shops for groceries and toiletries" "once a month accompanied by her kids" (R. 312), but states that Vasquez reported "no issues with" authority figures and had never "been fired or laid off from a job because of problems getting along with other people" (R. 315).

[2]    On January 18, 2013, Vasquez claimed that she could follow spoken, but not written, instructions (R. 250); on October 10, 2013, she claimed an inability to follow either (R. 289); and on January 23, 2014 she claimed she could follow both (R. 314).

[3]    On January 18, 2013, Vasquez denied that her conditions had any impact on her physical abilities aside from sitting (because of back pain) (R. 248-49), but on October 10, 2013 she claimed that her conditions limited her to 20 minutes of lifting, standing, walking and sitting, and entirely prevented her from climbing stairs or bending her knees (R. 287-88).

testified that she was treated for stress incontinence (R. 66-67) and migraine headaches (R. 56), but did not elaborate on the frequency or severity of either condition. Vasquez denied vision or hearing problems or substance abuse issues. (R. 63.)

Vasquez testified that she received mental health treatment (R. 61) and that she had daily visual and auditory hallucinations. (R. 64.) Vasquez stated that "every day" she would "cry for no apparent reason" and see and have conversations with a "shadow" named "Lolita" that told Vasquez "negative things." (R. 64, 67.) Before the onset of her psychiatric disorders, Vasquez would go out and socialize with friends, but no longer did so. (R. 65.) Vasquez had "daily" incapacitating anxiety attacks triggered by "traumatic memories" that lasted fifteen minutes in January 2013 (R. 251-52), and between one to two hours in October 2013 (R. 292).

**Medical Evidence Before the ALJ**

### Evidence Of Psychological Limitations

#### FEGS[4/]

A July 24, 2012 FEGS biopsychosocial summary completed by FEGS social worker Nancy Stremmel stated that Vasquez denied "suicidal/homicidal ideation, plan or intent and . . . denie[d] auditory command hallucinations." (R. 364, 367.) Vasquez reported that in the weeks prior she had felt depressed or hopeless and had trouble sleeping for several days, had little interest or pleasure in doing things, and lacked concentration and felt tired nearly every day. (R. 364.) Vasquez was sometimes able to travel independently and took the bus to her FEGS appointment,

---

[4/]      "FEGS stands for Federation Employment & Guidance Service, which 'was a non-profit organization that worked to provide a variety of health and human services, including employment, career, and workforce development, as well as disability and rehabilitation programs.'" Guerrero v. Colvin, 16 Civ. 3290, 2016 WL 7339114 at *1 n.1 (S.D.N.Y. Dec. 19, 2016) (Peck, M.J.).

and could care for herself and her home, watch television, shop for groceries, cook, read and socialize. (R. 365.) Vasquez's psychiatric evaluation noted her abnormal mood, affect and dysphoria. (R. 371.)[5/]

Vasquez returned to FEGS on February 6, 2013 with complaints of depression and insomnia, and was diagnosed with "[d]epressive disorder, not elsewhere classified," "[a]nxiety state, unspecified," and migraines. (R. 372-74.) "Cognitive/Interpersonal/Adaptive" limitations, specifically "[c]oncentration problems," were noted. (R. 374.) FEGS recommended further evaluation of Vasquez's "untreated depression and anxiety with moderate to severe vocational impairment." (R. 375.)

On January 23, 2014, FEGS entitlement specialist Norma Tejada completed a third party function report on Vasquez's behalf. (R. 309.) The report described Vasquez's sleep, memory and concentration issues, hallucinations, and inability to handle stress. (R. 310, 314-15.) The report also stated that Vasquez had no issues with personal care, could prepare her own meals, use public transportation, go shopping and manage her finances. (R. 310-12.) Vasquez also could follow written and spoken instructions, had no issues with authorities, and could adapt to change. (R. 314-15.)

Notes from an April 30, 2014 FEGS visit with physician Deepak Sawlani state that Vasquez had no sensory, communication, cognitive, or interpersonal limitations, and no limitations "[m]aintaining energy level, sustaining attendance, achieving adequate work pace and productivity." (R. 456-57.) However, Vasquez's history of anxiety caused emotional (tolerating stress, adapting

---

[5/]     "Dysphoria" is defined as "disquiet; restlessness; malaise." Dorland's Illustrated Medical Dictionary at 579 (32d ed. 2012).

to change) and environmental (tolerating exposure to heights, operating a vehicle) limitations. (R. 457.)

A May 7, 2014 biopsychosocial summary completed by FEGS social worker Gladys Peri stated that Vasquez reported a history of bipolar disorder, panic attacks, anxiety and schizophrenia. (R. 436.) Vasquez denied suicidal or homicidal ideation, but, as recently as two days prior, experienced auditory hallucinations of three voices fighting and telling her what to do. (R. 436-37.) Vasquez was alert, oriented, responsive and well-groomed during her FEGS interview. (R. 441.)

On May 9, 2014, Dr. Sawlani diagnosed Vasquez with "[s]chizophrenic," "[a]nxiety, dissociative and somatoform disorders." (R. 460-61.) In Vasquez's functional capacity determination, Dr. Sawlani wrote that Vasquez was potentially unable to work due to her schizophrenia and anxiety symptoms that were expected to last at least a year. (R. 461-62.)

### Clay Avenue Health Center[6/]

On October 24, 2012, Vasquez had an initial psychiatric evaluation with nurse practitioner Esther Aguirre of Clay Avenue Health Center for complaints of depression and anxiety. (R. 469-72.) Vasquez reported that "[t]he first episode occurred in 2005" and that her symptoms had worsened. (R. 469.) Vasquez reported that it was "very difficult" to function; she presented with "anxious/fearful thoughts, compulsive thoughts, decreased need for sleep, depressed mood, difficulty concentrating, difficulty falling asleep, difficulty staying asleep, diminished interest or pleasure, excessive worry, feelings of guilt, hallucinations (auditory), paranoia, racing thoughts and

---

[6/] The records contained in Exhibit 13F were transmitted by the Acacia Network (R. 463), and the Commissioner refers to the treating facility as Promesa (Dkt. No. 15: Comm'r Br. at 7). The Court, however, uses Clay Avenue Health Center to refer to all records contained in Exhibit 13F. (R. 463-644.)

restlessness." (Id.)  Risk factors included Vasquez's "history of depression," "social isolation" and past abuse.  (Id.)  Vasquez reported a "severe [history] of sexual abuse by her grandfather for several years at age 6/7" and that she could no longer handle her worsening behavior.  (Id.)  Although she attempted to commit suicide three years prior and "at times" endorsed suicidal (but not homicidal) ideation, Vasquez denied any current "plan or intent."  (Id.)

Nurse Aguirre found that Vasquez presented with appropriate appearance; clear speech; unremarkable behavior and thought content; intact memory; cooperative but discouraged attitude; anxious and depressed mood; constricted affect; fair reasoning, impulse control, judgment and insight; and was oriented to person, place, time and situation.  (R. 379, 470.)[2/]  Nurse Aguirre further found that Vasquez "has auditory hallucinations" and her "[t]hought content reveals paranoia."  (R. 379.)  Nurse Aguirre diagnosed Vasquez with "[m]ood [d]isorder, [o]ther," rule out "[b]ipolar depression," generalized anxiety and post-traumatic stress disorder ("PTSD"), with a GAF score of 50.  (R. 471.)  Vasquez had "[s]evere [p]roblems related to: education, finances, occupation, primary support group, [and] social environment."  (Id.)  Nurse Aguirre concluded that Vasquez "needs ASAP therapy."  (Id.)

From October 31, 2012 through December 17, 2012, Vasquez presented with anxiety and depression, reporting moderate improvement on medication; Vasquez exhibited no signs of psychosis, mania or overt delusions, but did report auditory hallucinations and paranoid thought content.  (R. 473-74, 476-77, 479-80, 482-83.)  Nurse Aguirre's other findings during these visits were similar to those made on October 24, 2012, including unremarkable behavior; fair reasoning,

---

[2/]    The Court had to piece together the Clay Avenue Health Center records from two duplicate copies in the record, both of which are poorly photocopied.  (Compare, e.g., R. 377-79, with R. 469-71.)

impulse control, judgment and insight; and orientation to person, place, time and situation. (R. 473-74, 476-77, 479-80, 482-83.) Nurse Aguirre diagnosed Vasquez with "[m]ood [d]isorder, [o]ther," generalized anxiety and PTSD, and reiterated her GAF score of "50 on 10/24/2012." (R. 474, 477, 480, 483.)

On December 18, 2012, Vasquez participated in an individual therapy session with Yessenia Palomino, LMSW. (R. 486-89.) Vasquez presented with "depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure, fatigue, feelings of guilt, loss of appetite, restlessness and thoughts of death or suicide." (R. 486.) Vasquez stated that there had been "no improvement" in her depression or anxiety, functioning was "extremely difficult," and she had "severe" auditory hallucinations daily. (Id.) Vasquez underwent a second individual therapy session with Palomino on January 18, 2013, who wrote that Vasquez's "thought process appears to be concrete attributing cure from depression deriving from external factors alone (medication, therapy, treatment, etc)." (R. 494.) Vasquez was oriented to person, place, time and situation, had poor insight and reasoning, and fair impulse control and judgment. (R. 494-95.)

Vasquez sought further treatment with Nurse Aguirre on January 7 and February 20, 2013. (R. 490, 500.) At both visits, Vasquez was "a bit more stable," not sleeping well, continued to experience auditory hallucinations (but not overt delusions), and denied suicidal/homicidal plan or intent. (R. 490, 500.) Vasquez reported these same symptoms on March 19 and April 16, 2013, and had a GAF score of 51. (R. 504-06, 508-10.)

Nurse Aguirre completed two New York City Human Resources Administration wellness forms on April 16 and May 14, 2013, on which she indicated that Vasquez's functional limitations rendered her unable to work for at least twelve months. (R. 413-16.)

Vasquez attended a third individual therapy session with Palomino on May 2, 2013 at which she presented with "depressive state," "flat affect" and dissociative feelings, denied suicidal or homicidal intent, and reported visual and auditory hallucinations. (R. 512.) Vasquez was oriented to person, place, time and situation, her reasoning and impulse control were fair, but her judgment and insight were poor. (Id.)

Vasquez saw Nurse Aguirre another fifteen times from May 14, 2013 through March 19, 2014. (R. 519-94.) The treatment notes for these visits are essentially the same: Vasquez presented with poor sleep patterns, anxiety, depression and auditory hallucinations, but had no suicidal or homicidal intent, no overt delusions, no signs of psychosis or mania, appropriate appearance, unremarkable behavior, fair reasoning, impulse control, judgment, and insight, was oriented to person, place, time and situation, with average intellect, intact memory and a GAF that fluctuated between 56 and 59. (R. 519-20, 523-24, 526-28, 534-36, 539-41, 544-47, 549-52, 554-57, 559-62, 564-67, 569-72, 574-77, 579-82, 584-87, 589-92.)

Nurse Aguirre wrote a "To Whom It May Concern" letter on September 17, 2013 stating that Vasquez was treated for schizoaffective disorder, anxiety disorder with panic attacks and PTSD. (R. 417.) She wrote that despite compliance with medication, Vasquez still experienced a number of symptoms including panic attacks, paranoia, hopelessness, poor concentration, sleep disturbance and auditory hallucinations. (Id.) Nurse Aguirre opined that these conditions, coupled with the side effects of her medication, so impacted Vasquez's "mood, thinking, [and] memory" that she could not maintain employment. (Id.)

Nurse Aguirre wrote a second letter on December 11, 2013 that reiterated Vasquez's treatment history. (R. 429.) Nurse Aguirre stated that Vasquez had been compliant with treatment, but "continues endorsing depression and anxiety and mood swings and [s]leep disturbances." (Id.)

Nurse Aguirre opined that these conditions, coupled with the side effects of her medication, so impacted Vasquez's "mood, memory, concentration, and sleep pattern" that she could not maintain employment. (Id.)

On May 21, 2014, Vasquez obtained a psychiatric evaluation from nurse practitioner Brianna Morrison. (R. 599.) Vasquez reported that her depression had improved since her initial visit with Nurse Aguirre on October 23, 2012 and denied suicidal or homicidal intent. (R. 599, 603.) Vasquez presented with appropriate appearance and affect, unremarkable behavior, psychomotor behaviors and thought content, clear speech, intact memory, depressed mood, clear consciousness sensorium, average intellect, cooperative attitude, gained attention, logical thought processes, and fair reasoning, impulse control, judgment and insight. (R. 603.) Moreover, Vasquez was oriented to person, place, time and situation, denied auditory or visual hallucinations, and had a GAF score of 57. (Id.)

Vasquez's seven remaining treatment notes from Nurse Morrison, dated July 31, 2014 through March 24, 2015, include little detail other than a manic depressive disorder diagnosis. (See R. 609-12, 618-19, 629-39.) There are no reports of auditory or visual hallucinations in any of these treatment notes. (Id.) Nurse Morrison also included Vasquez's GAF scores, which ranged from 59 to 62, increasing over time. (R. 610, 612, 619, 630, 633, 636, 639.)

**Industrial Medicine Associates, P.C.**

On January 22, 2013, Vasquez underwent a consultative psychiatric evaluation by Melissa Antiaris, Psy.D., of Industrial Medicine Associates, P.C. (R. 350-53.) Vasquez stated that "her sleep is normal now with medications and her appetite is also normal," but reported a history of "[d]epressive symptoms," "[a]nxiety related symptoms and panic attacks," and hallucinations. (R. 350.) Dr. Antiaris wrote:

The claimant reports that she has been depressed since she was a child. It has been on and off over the years, but she currently feels depressed daily. She [c]ites dysphoric moods and crying spells. She denies any current suicidal or homicidal ideation. . . . The claimant reports that she is very nervous and she has shaky hands and a shaky body. When she feels very shaky she must sit down because she feels unable to walk. . . . She is not sure if it is a panic attack. . . . The claimant reports that for many years she experiences auditory hallucinations in the form of three voices. Lolita is command at times. She has told her before to throw acid on someone, but the claimant was able to ignore her. Carman is calm and Maria is funny. She reports that sometimes they can be persecutory in nature. She was unable to explain further.

(R. 350-51.) No manic or cognitive symptoms were noted. (Id.)

During her mental status examination, Vasquez appeared "well groomed," "dressed appropriately," was "cooperative and related adequately," and made "appropriate" eye contact. (R. 351.) Her "[s]peech was somewhat mumbled at times, but clear other times" and "[e]xpressive and receptive language both appeared adequate." (Id.) Dr. Antiaris noted that Vasquez appeared "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia" with a "[e]uthymic" mood, clear sensorium, and an affect "[o]f full range and appropriate in speech and thought content." (Id.)

Vasquez's attention, concentration and memory were "[m]ildly impaired due to limited intellectual functioning" that prevented her from performing "simple calculations" or "serial 3s." (R. 352.) Cognitive functioning was "in the borderline range" although Vasquez's "[g]eneral fund of information [was] appropriate to experience." (Id.) Her insight and judgment were poor. (Id.) Vasquez was "able to dress, bathe, and groom herself, as well as cook, clean, complete laundry, . . . shop independently . . .[,] manage her own funds and take public transportation." (Id.) Vasquez reported that she was "not being social at this time," has no hobbies or interests, and spent her day maintaining her home and sometimes going outside for a walk. (Id.)

Based on the foregoing, Dr. Antiaris concluded:

The claimant can follow and understand simple directions and instructions. She can perform simple tasks independently. She is able to maintain attention and concentration as well as a regular schedule. She can learn new tasks and she can perform complex tasks with supervision. She can make appropriate decisions. She relates adequately with others. She does not appropriately deal with stress. Difficulties are caused by psychotic symptoms.

The results of the examination appear to be consistent with psychiatric problems, but in itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

(Id.) Dr. Antiaris diagnosed Vasquez with schizoaffective disorder and asthma, and recommended that she "continue with her current psychological and psychiatric treatment as provided." (R. 353.)

On November 8, 2013, Vasquez underwent a second consultative psychiatric evaluation by Dr. Antiaris. (R. 422-26.) Vasquez reported difficulty falling and staying asleep and loss of appetite. (R. 422.) Vasquez felt depressed "every day" and described "dysphoric moods, crying spells, hopelessness, loss of usual interests, . . . irritability[,] . . . fatigue, loss of energy, worthlessness, diminished self esteem, and social withdrawal," but denied suicidal or homicidal ideation. (R. 422-23.) Vasquez experienced auditory and visual hallucinations that included seeing a woman named Lolita with whom she had regular conversations. (R. 423.)

Dr. Antiaris observed that Vasquez was well groomed, dressed appropriately, made appropriate eye contact, had fluent and clear speech, and her thought process was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." (R. 423-24.) Vasquez's limited intellectual functioning impaired her attention and concentration, her cognitive functioning was "in the borderline range," and her insight and judgment were poor. (R. 424.) Vasquez could "dress, bathe, and groom herself," "manage her funds and take public transportation . . . ." (Id.)

Dr. Antiaris opined that Vasquez was not limited in her "ability to follow and understand simple directions and instructions or perform simple tasks independently." (R. 424-25.) However, Vasquez was "moderately limited in her ability to maintain attention and concentration and a regular schedule," "learn new tasks and perform complex tasks independently," or "make appropriate decisions and relate adequately with others." (R. 425.) Vasquez also was markedly limited "in her ability to appropriately deal with stress." (Id.) These difficulties, Dr. Antiaris wrote, were caused by Vasquez's "psychotic symptoms" that "may significantly interfere with the claimant's ability to function on a daily basis." (Id.) Dr. Antiaris diagnosed Vasquez with schizoaffective disorder, migraines, thyroid problems and asthma; her overall prognosis was fair. (Id.)

### Other Consultative Opinions

On March 13, 2013, V. Reddy, Ph.D., submitted a consultative psychiatric review which opined that Vasquez had mild restrictions in activities of daily living and social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (R. 80.) Specifically, Dr. Reddy found that Vasquez was moderately limited in her ability to maintain attention and concentration for extended periods and respond appropriately to changes in a work setting, but was not significantly limited in the remaining categories of understanding and memory, sustained concentration and persistence, social interaction or adaptation limitations. (R. 81-83.) Dr. Reddy further found that Vasquez was "able to do self care, cook, clean, launder, shop, manage money, [and] take public transportation." (R. 83.) Vasquez reported daily depression, nervousness, and auditory hallucinations. (Id.) Dr. Reddy noted Vasquez's "mildly limited attention/concentration/memory," "borderline" cognitive function, and poor "insight/judgment." (Id.) Dr. Reddy, however, found no evidence of auditory hallucinations, and noted Vasquez's full

range of affect and euthymic mood.  (Id.)  Dr. Reddy opined that Vasquez was not disabled and could perform unskilled work.  (R. 84.)

On December 5, 2013, T. Harding, Ph.D., submitted a consultative medically determinable impairments form opining that Vasquez had mild restrictions in activities of daily living, and moderate difficulties in social functioning and maintaining concentration, persistence or pace.  (R. 101.)  In particular, Dr. Harding found that Vasquez was moderately limited in her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the public, to respond appropriately to changes in the work setting, and to set realistic goals and make plans independently.  (R. 104-05.)  Vasquez was not significantly limited in the remaining categories of understanding and memory, sustained concentration and persistence, social interaction or adaptation limitations.  (Id.)  Vasquez was well dressed, and exhibited normal behavior and no thought disorder.  (R. 105.)  Vasquez presented with a flat affect, dysthymic mood, poor insight and judgment.  (Id.)  Dr. Harding opined that Vasquez was not disabled and could perform unskilled work.  (R. 105-07.)

**Evidence Of Physical Limitations**

**FEGS**

On July 24, 2012, Vasquez reported a thyroid condition, unspecified heart condition, asthma and a history of migraines that sometimes reached a ten out of ten on the pain scale.  (R. 370-71.)  Physician Anthony Greenridge wrote that Vasquez was limited to walking, climbing and standing one to three hours at a time.  (R. 371.)  Vasquez was further limited to lifting, carrying and pushing twenty pounds, and pulling ten pounds, one to ten times per hour, and restricted to a low stress environment.  (R. 372.)  Dr. Greenridge wrote that Vasquez had joint swelling and mild swelling at the right foot with no tenderness.  (R. 371.)

On February 6, 2013, Vasquez reported migraines, asthma, an unspecified heart condition, and a thyroid condition. (R. 375.)

On April 30, 2014, FEGS physician Deepak Sawlani wrote that Vasquez had two out of ten moderate knee pain that increased with activity. (R. 455.) No swelling was present in either knee, and Vasquez's musculoskeletal exam was normal aside from joint pain and range of motion. (R. 450, 454.) Vasquez had no lifting, pushing, pulling, sitting, reaching, kneeling, squatting, postural or manipulative limitations, but was limited to one to three hours of standing and walking. (R. 455-56.) Dr. Sawlani recommended that Vasquez's work accommodations include no prolonged walking, a low stress environment, and elimination of dust, smoke, odor and fumes. (R. 458.)

On May 7, 2014, Vasquez reported migraines, arthritis in both knees, thyroid problems, blood clots and swelling in both feet. (R. 434, 441.) Vasquez denied difficulty walking, climbing stairs, or performing activities of daily living. (R. 439.)

**Industrial Medicine Associates, P.C.**

On November 8, 2013, Vasquez underwent a consultative internal medicine examination by John Fkiaras, M.D. (R. 418.) Vasquez reported a history of asthma, but denied "being hospitalized or intubated" as a result. (Id.) Vasquez became short of breath walking more than three to four blocks, climbing more than two flights of stairs, or lifting more than ten pounds. (Id.) Vasquez reported aching right knee pain for the past nine months, rated a six out of ten on the ten point pain scale. (Id.) Vasquez's right knee pain made it difficult to walk, squat or stand more than 45 minutes. (Id.) Vasquez also described her history of daily "pounding" migraine headaches rated a nine out of ten on the pain scale that induced nausea and vomiting. (Id.) Vasquez "denie[d] any hospitalizations or other past medical history." (Id.)

Dr. Fkiaras observed that Vasquez was not in acute distress, had a normal gait and stance, could walk on her heels and toes and rise from her chair without difficulty, used no assistive devices, and needed no help changing or getting on and off the exam table. (R. 419.) Vasquez had full bilateral flexion in her cervical spine, no abnormality in the thoracic spine, full bilateral lateral flexion and extension in her lumbar spine, and full range of motion in her shoulders, elbows, forearms, wrists, hips and ankles bilaterally. (R. 420.) Vasquez's right knee flexion was limited to 145 degrees with mild crepitus. (Id.) Strength in the upper and lower extremities, and grip strength bilaterally, was "5/5." (Id.)

Dr. Fkiaras diagnosed Vasquez with right knee pain, migraines, and asthma. (R. 420.) He described her prognosis as "[f]air," and stated that Vasquez had a "moderate limitation squatting, kneeling, and crouching," "should avoid smoke, dust, and known respiratory irritants secondary to asthma," and "should avoid any heavy lifting." (R. 420-21.)

**Clay Avenue Health Center**

On September 13, 2012, Vasquez underwent a physical examination with Robert Balthazar, M.D. (R. 464-68.) Vasquez had "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection," normal mobility in her lumbar, thoracic and cervical spine, and full range of motion in her hips and knees. (R. 467.)

On January 31, 2013, Vasquez saw Dr. Balthazar for severe, recurring migraines aggravated by bright lights and noise, rated seven out of ten on the pain scale. (R. 497.) Vasquez denied blurred vision, dizziness, fever, nausea or vomiting associated with the headaches. (Id.)

On May 13, 2013, Vasquez saw nurse practitioner Elizabeth Holt for moderately severe migraines that occurred three times per month, aggravated by stress, anxiety and bright lights. (R. 515.) Vasquez's migraines caused nausea, photophobia and phonophobia, but not dizziness,

fever, or loss of consciousness. (Id.)[8] Nurse Holt found that Vasquez had no motor weakness, normal fine motor skills, and intact balance, gait and coordination. (R. 517.)

On July 2, 2013, Vasquez had a physical with Dr. Peter Marcus (R. 531-33), who noted edema in Vasquez's ankles and feet bilaterally (R. 532).[9]

On March 25, 2014, Vasquez saw Dr. Marcus for asthma attacks, sleep issues, and knee, back and ankle pain. (R. 595.) Vasquez claimed that her back pain radiated to her lower extremities particularly on the right side, and had pain and stiffness in her knees when climbing stairs. (Id.) Vasquez's chronic problems included urinary stress incontinence, obstructive sleep apnea, degenerative joint disease of the knee, migraines, asthma and radiculopathy.[10] Dr. Marcus referred Vasquez for a sleep study to treat her sleep apnea (R. 607), but Vasquez never went (R. 641). Vasquez had posterior spinal tenderness, paravertebral muscle spasms, bilateral lumbosacral tenderness, full range of motion in her hips, "medial meniscus tenderness and crepitus" in the right knee, and "mild lateral meniscus tenderness" in the left knee. (R. 597.)

On September 23, 2014, Vasquez reported stiffness in both knees that made it difficult to use stairs without pain. (R. 621.) Vasquez, however, took "nothing for [the] pain" (id.), and Dr. Marcus found that despite bilateral meniscus tenderness and crepitus, Vasquez had full

---

[8]     "Photophobia" is defined as an "abnormal visual intolerance of light." Dorland's Illustrated Medical Dictionary at 1441 (32d ed. 2012). "Phonophobia" is defined as an "irrational fear of sounds or of speaking aloud." Id. at 1435.

[9]     "Edema" is defined as "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues." Dorland's Illustrated Medical Dictionary at 593.

[10]    "Radiculopathy" is defined as a "disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur." Dorland's Illustrated Medical Dictionary at 1571.

range of motion in her knees (R. 623). Dr. Marcus recommended water exercises, ice, ACE bandages, Naprosyn and Tylenol for the pain. (Id.)

## ALJ Walters' Decision

On August 13, 2015, ALJ Walters denied Vasquez's application for benefits. (R. 9-24.) ALJ Walters applied the appropriate five step legal analysis. (R. 16-17.) First, she found that Vasquez "has not engaged in substantial gainful activity since March 1, 2012, the alleged onset date." (R. 17.) Second, ALJ Walters found that Vasquez had "the following severe impairments: migraines, obesity, and asthma; and, mental impairments variously diagnosed as depressive disorder, mood disorder, anxiety disorder, bipolar disorder, schizoaffective disorder, and post traumatic stress disorder." (Id.) In finding Vasquez's remaining impairments non-severe, ALJ Walters wrote:

> The claimant has been diagnosed with a thyroid disorder, but there is no evidence of treatment. There is no objective evidence to support the allegations of radiculopathy or obstructive sleep apnea. The claimant reported right knee pain to a consultative examiner, but there is no supporting objective evidence, and . . . the results of a consultative examination indicated mostly normal range of motion and gait.

(R. 18.)

Third, ALJ Walters found that Vasquez did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 18.) ALJ Walters specifically addressed Vasquez's asthma and mental impairments, finding Vasquez had only moderate difficulties in activities of daily living, social functioning, and concentration, persistence or pace. (Id.) ALJ Walters stated that Vasquez "reported to consultative examiner Dr. Antiaris that she is able to dress, bathe, and groom herself, as well as cook, clean, complete laundry, and shop independently . . . [and] can manage her own funds and take public transportation." (Id.) ALJ Walters further noted that Vasquez "was

cooperative, related adequately, and had appropriate eye contact" during her examination with Dr. Antiaris. (Id.)

As to intellectual functioning, ALJ Walters acknowledged that Dr. Antiaris described Vasquez's "limited intellectual functioning," "cognitive functioning . . . in the borderline range" and poor insight and judgment that impacted Vasquez's attention, concentration, memory and ability to complete basic calculations. (R. 18-19.) However, ALJ Walters found no evidence that Vasquez had experienced any episodes of decompensation of extended duration. (R. 19.) ALJ Walters also rejected the argument that Vasquez's impairments met a listing criteria because she remains in her bedroom and is dependent on her family for care. (Id.) ALJ Walters found that "this is not fully consistent with her presentation when she gets her routine, regular medical treatment, and there is no objective evidence to support her subjective allegations." (Id.)

ALJ Walters determined that Vasquez had the residual function capacity ("RFC") to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations: she is able to lift and carry ten pounds frequently and twenty pounds occasionally; she is able to sit for about six hours of an eight hour workday; she is able to stand and/or walk for about six hours of an eight hour workday; she should avoid concentrated exposure to fumes, odors, dusts, smoke, gases, poor ventilation (and so forth); she is limited to occasional climbing of ramps and stairs; she is limited to occasional kneeling, crouching, and crawling; she is able to perform simple, repetitive tasks; she is limited to no more than occasional interaction with supervisors, coworkers, and the public; and she is precluded from work at a production pace (such as sustained fast-paced activity or work with requirements for meeting explicit quotas, deadlines or schedules), but work at a normal production pace is not ruled out.

(R. 19.) "In making this finding," ALJ Walters "considered all symptoms and the extent to which" they were consistent with the medical evidence in the record. (R. 19-20.)

ALJ Walters found that Vasquez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but Vasquez's complaints as to the

"intensity, persistence and limiting effects of these symptoms" were "not entirely credible." (R. 20.)

ALJ Walters noted that Vasquez's reports of auditory hallucinations changed throughout the course

of her treatment, there was no witness to her hallucinations, no hospitalizations, and none of her

treatment providers expressed any "great alarm." (Id.) Moreover, Vasquez's treatment notes with

Clay Avenue Health Center members Dr. Marcus, Nurse Aguirre and Nurse Morrison "have been

routine with no clinical indication of disabling limitations." (Id.) Notes from Vasquez's initial visit

with Nurse Aguirre on October 24, 2012 and her subsequent psychiatric examinations at Clay

Avenue Health Center "indicated similar subjective complaints," including anxiety, depression,

sleep issues, auditory hallucinations and paranoia, "with routine treatment." (R. 20-21.)

ALJ Walters gave little weight to Nurse Aguirre's opinion that Vasquez was unable

to work due to depression and anxiety because the ultimate determination of disability is reserved

to the Commissioner, and "the moderate findings noted during the claimant's mental status

examinations indicate some limitations caused by paranoia and hallucinations but not at disabling

levels." (R. 21.)

ALJ Walters gave great weight to Dr. Antiaris' January 2013 consultative

examination as it was "consistent with her exam findings and with the claimant's history of treatment

for depression and anxiety." (Id.) However, with regard to Dr. Antiaris' November 2013

consultative examination, ALJ Walters gave little weight to Dr. Antiaris' opinion that Vasquez had

marked limitations in her ability to deal with stress because it was "inconsistent with the claimant's

routine treatment record" at Clay Avenue Health Center. (R. 21-22.) Vasquez's moderate

limitations were "given considerable weight" since they were "consistent with [Vasquez's] history

of treatment for depression and anxiety." (R. 22.)

ALJ Walters gave little weight to Norma Tejada's January 23, 2014 function report, as Tejada was a FEGS entitlement specialist and her report was based solely on Vasquez's self-report.  (Id.)

Although state agency psychological consultant Dr. Reddy opined that Vasquez had moderate limitations responding appropriately in the work setting and no other significant limitations, ALJ Walters found that Vasquez's treatment history supported additional limitations, and accorded Dr. Reddy's opinion "some weight."  (Id.)

With regard to Vasquez's physical impairments, ALJ Walters found that the record reflected no regular treatment.  (Id.)  Dr. Fkiaras' consultative opinion that Vasquez had "moderate limitation with squatting, kneeling, and crouching, should avoid heavy lifting" and exposure to respiratory irritants, was entitled to "considerable weight" because it was consistent with the results of his examination.  (Id.)

Dr. Greenridge's opinion that Vasquez was limited to light work was given little weight because Vasquez testified that she never saw Dr. Greenridge and his opinion was not supported by clinical evidence.  (R. 23.)[11]

At the fourth step, ALJ Walters determined that Vasquez could no longer perform her past relevant work as a babysitter and home attendant.  (R. 23.)  However, given Vasquez's "age, education, work experience and residual functional capacity, there [were] jobs that exist[ed] in significant numbers in the national economy" that she could perform.  (Id.)  ALJ Walters relied on the vocational expert's hearing testimony (R. 69-72) to determine that a person with Vasquez's limitations could perform unskilled work as a mail clerk, photocopy machine operator, and office

---

[11]  Vasquez's hearing testimony was not so definitive; rather, she only testified that she did not remember seeing Dr. Greenridge.  (See R. 63.)

helper.  (R. 24.)  Accordingly, ALJ Walters concluded that Vasquez was not "under a disability, as defined in the Social Security Act, from March 1, 2012" through August 13, 2015, the date of the ALJ's decision.  (Id.)

## ANALYSIS

I.   **THE APPLICABLE LAW**

   A.   **Definition Of Disability**

   A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[12]

   > An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

---

[12]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[13]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[14]

**B.      Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[15] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the

---

[13]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[14]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[15]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[16/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[17/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[18/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

---

[16/] See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[17/] See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[18/] See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[19/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[19/]      Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774; see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[20/]

## II.     VASQUEZ'S ARGUMENTS ARE MERITLESS

Vasquez argues that ALJ Walters: (1) erred in finding that Vasquez could perform full time work despite her mental impairments (Dkt. No. 13: Vasquez Br. at 1-13); (2) erred in determining Vasquez's credibility regarding her hallucinations (id. at 10-12); (3) failed to consider the combination of Vasquez's mental and physical impairments in determining Vasquez's RFC (id. at 14-18); and (4) should have further developed the record (id. at 12-13).

### A.     ALJ Walters Properly Considered Vasquez's Mental Impairments

Vasquez argues that "[a]ll of the medical opinions in this case support a finding that plaintiff does not have the mental capability to perform full time work as required by the Social Security Act." (Dkt. No. 13: Vasquez Br. at 2-3.)  In particular, Vasquez argues that ALJ Walters erred in according little weight to Nurse Aguirre's four reports stating that Vasquez was unable to work.  (Vasquez Br. at 3; see page 20 above.)  ALJ Walters gave little weight to Nurse Aguirre's opinion that Vasquez was unable to work due to depression and anxiety because "the moderate findings noted during [Vasquez's] mental status examinations indicate some limitations caused by paranoia and hallucinations but not at disabling levels."  (See page 20 above.)  That finding is consistent with Vasquez's treatment records at Clay Avenue Health Center and elsewhere.

Vasquez consistently presented with complaints of anxiety, depression and auditory hallucinations throughout her psychiatric treatment at Clay Avenue, from October 24, 2012 through

---

[20/]     See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

March 24, 2015. (See pages 6-10 above.) Vasquez exhibited more severe symptoms at some of her early visits, such as her December 18, 2012 therapy session with social worker Yessenia Palomino, at which Vasquez claimed that she experienced "severe" auditory hallucinations daily and that functioning was "extremely difficult." (See page 8 above.) From December 18, 2012 to May 2013, Vasquez's symptoms fluctuated. (See, e.g., R. 490, 500 (January 7 and February 20, 2013 records stating Vasquez "a bit more stable" despite auditory hallucinations); R. 512 (May 2, 2013 record stating Vasquez was in "depressive state" with dissociative feelings, auditory and visual hallucinations).)

Vasquez saw Nurse Aguirre another fifteen times between May 14, 2013 and March 19, 2014 with substantially the same results at each visit. Despite reporting poor sleep patterns, auditory hallucinations, anxiety and depression, Vasquez denied suicidal or homicidal intent, had no overt delusions, no signs of psychosis or mania, appropriate appearance, unremarkable behavior, fair reasoning, impulse control, judgment and insight, was oriented to person, place, time and situation, with average intellect and intact memory. (See page 9 above.) Moreover, Vasquez's GAF score fluctuated between 56 and 59 throughout these visits, suggesting no more than "moderate symptoms or moderate difficulty in social, occupational, or school situations." Petrie v. Astrue, 412 F. App'x 401, 406 n.2 (2d Cir. 2011).

Furthermore, at her May 21, 2014 psychiatric evaluation with nurse practitioner Brianna Morrison, Vasquez reported that her depression had improved since her initial visit with Nurse Aguirre on October 24, 2012. (See page 10 above.) Vasquez denied suicidal or homicidal intent, presented with appropriate appearance and affect, unremarkable behavior, psychomotor behaviors or thought content, clear speech, intact memory, clear consciousness sensorium, average intellect, cooperative attitude, gained attention, logical thought processes, and fair reasoning,

impulse control, judgment and insight. (See page 10 above.) Vasquez additionally was oriented to person, place, time and situation, denied auditory or visual hallucinations, and had a GAF score of 57 indicating moderate symptoms. Petrie v. Astrue, 412 F. App'x at 406 n.2; see page 10 above.

Vasquez's seven remaining treatment notes from Nurse Morrison, dated July 31, 2014 through March 24, 2015, include little detail other than a manic depressive disorder diagnosis, but do not mention auditory or visual hallucinations. (See page 10 above.) Vasquez's GAF scores ranged from 59 to 62, increasing over time. (See id.) A GAF score over 60 "indicate[s] some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships." Petrie v. Astrue, 412 F. App'x at 406 n.2.

The remaining psychiatric records do not contradict ALJ Walters' overall finding of nondisability. On January 22, 2013, Melissa Antiaris, Psy.D., documented Vasquez's auditory hallucinations, mildly impaired concentration and memory, borderline cognitive functioning, and poor insight and judgment. (See pages 10-11 above.) However, Vasquez was "well groomed," "dressed appropriately," "cooperative, related adequately," made "appropriate" eye contact, and her "[e]xpressive and receptive language both appeared adequate." (See page 11 above.) She furthermore appeared "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia" with a "[e]uthymic" mood, clear sensorium, and an affect "[o]f full range and appropriate in speech and thought content." (See id.) Vasquez was "able to dress, bathe, and groom herself, as well as cook, clean, complete laundry, . . . shop independently . . .[,] manage her own funds and take public transportation." (See id.) Dr. Antiaris concluded that while Vasquez could not appropriately deal with stress, her psychiatric issues did "not appear to be significant enough to interfere with [her] ability to function on a daily basis." (See page 12 above.)

On November 8, 2013, Vasquez reported more severe psychiatric limitations to Dr. Antiaris, who found that Vasquez was markedly limited "in her ability to appropriately deal with stress." (See page 12 above.)[21/] But Dr. Antiaris observed that Vasquez was well groomed, dressed appropriately, made appropriate eye contact, had fluent and clear speech, and her thought process was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." (See page 12 above.)[22/]

---

[21/]      ALJ Walters assigned little weight to Dr. Antiaris' opinion that Vasquez had marked limitations in her ability to deal with stress because it was "inconsistent with the claimant's routine treatment record" at Clay Avenue Health Center. (See page 20 above.) Vasquez challenges this finding because "ALJ Walters did not cite to any record . . . that plaintiff could handle stress." (Vasquez Br. at 13.) Even if the Clay Avenue records contained no specific finding as to Vasquez's ability to handle stress, ALJ Walters appropriately found that the records as a whole documented no more than moderate limitations, and thus undermined a finding of marked limitation in this regard. See, e.g., Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say."); Worthy v. Berryhill, No. 15-CV-1762, 2017 WL 1138128 at *9 (D. Conn. Mar. 27, 2017) ("The ALJ also properly relied on elements of [claimant's] longitudinal medical history that at least indirectly undermined the weight of Dr. Franklin-Zitzkat's opinion. Neither the ALJ nor either party here identified any evidence in the record that any other examining or treating physician had directly addressed [claimant's] memory or concentration issues. Instead, however, the ALJ pointed to evidence in the record that [claimant] had 'a normal mood and affect' and that his mental functioning was 'stable.' . . . Those observations were not made with the pressures and stresses of the workplace in mind, and they do not directly discuss [claimant's] memory or concentration. Nevertheless, the ALJ was 'entitled to consider the lack of evidence demonstrating severe mental limitations,' such as marked difficulties with memory and concentration, in assessing the weight of Dr. Franklin-Zitzkat's opinions." (citations omitted)).

[22/]      Dr. Antiaris also opined that Vasquez was "moderately limited in her ability to maintain attention and concentration and a regular schedule," "learn new tasks and perform complex tasks independently," or "make appropriate decisions and relate adequately with others." (See page 13 above.) Vasquez claims that because ALJ Walters gave considerable weight to Dr. Antiaris' findings in this regard, ALJ Walters should have found Vasquez disabled "especially in light of the [vocational expert's] testimony that a person would not be able to work if she was off task 15% of the time or if she was absent two times a month, or would be late for work at least once a week by two hours." (Vasquez Br. at 6.) However, ALJ Walters accounted for Vasquez's moderate mental impairments by limiting her to "simple,

(continued...)

V. Reddy, Ph.D., opined that Vasquez had mild to moderate restrictions and was "able to do self care, cook, clean, launder, shop, manage money, [and] take public transportation." (See page 13 above.)  Although Vasquez reported daily depression, nervousness, and auditory hallucinations, Dr. Reddy found no evidence of auditory hallucinations, and noted Vasquez's full range of affect and euthymic mood.  (See pages 13-14 above.)  Dr. Reddy opined that Vasquez was not disabled and could perform unskilled work.  (See page 14 above.)

T. Harding, Ph.D., opined that Vasquez had mild to moderate restrictions.  (See page 14 above.)  Dr. Harding found that Vasquez presented with a flat affect, dysthymic mood, poor insight and judgment, but he also noted that she was well dressed, and exhibited normal behavior

---

[22]/     (...continued)
repetitive tasks[,] . . . no more than occasional interaction with supervisors, coworkers, and the public," and precluding "work at a production pace." (See page 19 above.)  ALJ Walters further utilized a vocational expert to determine that a person with Vasquez's limitations could perform three occupations classified as unskilled work.  (See page 21 above); see, e.g., Martinez v. Comm'r of Soc. Sec., 13 Civ. 0159, 2016 WL 6885181 at *14 (S.D.N.Y. Oct. 5, 2016) ("[L]imitations in concentration, dealing with stress, and socialization have been found to be consistent with an RFC for unskilled work."), R. & R. adopted, 2016 WL 6884905 (S.D.N.Y. Nov. 21, 2016); Landers v. Colvin, No. 14-CV-1090, 2016 WL 1211283 at *4 (W.D.N.Y. Mar. 29, 2016) ("The determination that Plaintiff is limited to 'simple, repetitive, and routine tasks' accounts for Plaintiff's limitations as to maintaining attention and concentration, performing activities within a schedule, and maintaining regular attendance."); Abar v. Colvin, No. 15-CV-0095, 2016 WL 1298135 at *5 n.8 (N.D.N.Y. Mar. 31, 2016) ("Reviewing courts have found that, 'when medical evidence demonstrates that a claimant can engage in simple routine tasks or unskilled work despite limitations in concentration, persistence, and pace, limiting a plaintiff to only unskilled work sufficiently accounts for such limitations.'"); Reilly v. Colvin, No. 13-CV-00785, 2015 WL 6674955 at *3 (W.D.N.Y. Nov. 2, 2015) ("[G]enerally a limitation to only 'occasional' or 'limited' contact with others has been found sufficient to account for moderate limitations in social functioning." (citing cases)).

and no thought disorder. (See id.) Dr. Harding opined that Vasquez was not disabled and could perform unskilled work. (See id.)[23/]

Finally, Vasquez does not challenge ALJ Walters' findings with respect to the FEGS records, or otherwise argue that they support a finding of disability. (See generally Vasquez Br.) These records, while documenting Vasquez's varying symptoms, do not undermine ALJ Walters' RFC or nondisability finding. (See, e.g., R. 310-15 (January 23, 2014 function report stating Vasquez reported sleep, memory and concentration issues, hallucinations, and inability to handle stress, but also claimed she had no issues with personal care, could prepare her own meals, use public transportation, go shopping, manage her finances, follow written and spoken instructions, had no issues with authorities, and could adapt to change); R. 456-57 (April 30, 2014 notes stating Vasquez had emotional limitations, but no sensory, communication, cognitive, or interpersonal limitations, and no limitations to "[m]aintaining energy level, sustaining attendance, achieving adequate work pace and productivity"); R. 461-62 (May 9, 2014 functional capacity determination that Vasquez was "potentially" unable to work due to her schizophrenia and anxiety symptoms that were expected to last at least a year, without further explanation).)

ALJ Walters accordingly gave good reasons, supported by substantial evidence in the record, for discounting Nurse Aguirre's opinions and finding Vasquez not disabled, namely that

---

[23/] To the extent Vasquez argues that ALJ Walters erred by failing to assign weight to Dr. Harding's opinion (Vasquez Br. at 13), any such error was harmless because the RFC appropriately accounted for Vasquez's moderate limitations. (See page 29 n.22 above.) There is no indication that further consideration of Dr. Harding's opinion would have changed ALJ Walters' disability or RFC determinations. See, e.g., McKinstry v. Astrue, 511 F. App'x 110, 111 (2d Cir. 2013); Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) ("Because the report that the ALJ overlooked was not significantly more favorable to Petitioner, we find no reasonable likelihood that her consideration of the same doctor's 2002 report would have changed the ALJ's determination that Petitioner was not disabled during the closed period.").

Vasquez's treatment notes at Clay Avenue Health Center and elsewhere indicated moderate psychiatric impairments inconsistent with a finding of total disability.[24] See, e.g., Henny v. Comm'r of Soc. Sec., 16 Civ. 2551, 2017 WL 1194673 at *8 (S.D.N.Y. Mar. 15, 2017) ("'[T]he less consistent [a medical source's] opinion is with the record as a whole, the less weight it will be given.'"), R. & R. adopted, 2017 WL 1194483 (S.D.N.Y. Mar. 30, 2017); Guerrero v. Colvin, 2016 WL 7339114 at *20; Heitz v. Comm'r of Soc. Sec., 201 F. Supp. 3d 413, 423 (S.D.N.Y. 2016) ("Here, after granting only limited weight to the opinion of [claimant's] treating physician, the ALJ articulated specific reasons why she concluded the opinion to be both internally inconsistent and unsupported by the medical evidence, while providing specific examples of both. This is sufficient to satisfy the 'good reasons' requirement." (citing cases)).[25] For these same reasons, ALJ Walters' RFC determination was supported by substantial evidence and properly accounted for Vasquez's moderate mental impairments. (See page 29 n.22 above.)

---

[24] Furthermore, "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," Mack v. Comm'r of Soc. Sec., 12 Civ. 0186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013), since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). See also, e.g., Guerrero v. Colvin, 16 Civ. 3290, 2016 WL 7339114 at *20 (S.D.N.Y. Dec. 19, 2016) (Peck, M.J.) (citing cases).

[25] Given the sufficient record evidence supporting ALJ Walters' determination, the Court rejects Vasquez's argument that "ALJ Walters improperly relied on her own 'medical opinion' because she could not find one mental health professional who agreed with her." (Vasquez Br. at 10, citing Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("'[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'")); see, e.g., Oquendo v. Colvin, 12 Civ. 4527, 2014 WL 4160222 at *6 (S.D.N.Y. Aug. 19, 2014) ("ALJ Vecchio, accordingly, 'did not substitute [his] medical judgment for any physician's evaluation, but . . . relied upon the substantial medical records and the testimony to reach a reasoned determination of the plaintiff's work capacity.'").

**B.**     **ALJ Walters Did Not Err In Determining Vasquez's Credibility**

Because subjective symptoms only lessen a claimant's RFC where the symptoms

"'can reasonably be accepted as consistent with the objective medical evidence and other evidence,'

the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent

with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL

3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue,

465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is

required to take the claimant's reports of pain and other limitations into account,' he or she is 'not

require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may

exercise discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)

("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and

other limitations into account, but is not required to accept the claimant's subjective complaints

without question; he may exercise discretion in weighing the credibility of the claimant's testimony

in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310

F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the

ALJ must make credibility findings.'").[26]  In addition, "courts must show special deference to an

---

[26]     See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain
(continued...)

ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[27/]

When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9 (Mar. 16, 2016). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his

---

[26/]  (...continued)
complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[27/]  Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

impairment(s), his restrictions, his daily activities, his efforts to work, or any other
relevant statements he makes to medical sources during the course of examination
or treatment, or to the agency during interviews, on applications, in letters, and in
testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted) (citing 20 C.F.R. §§

404.1529(a), 404.1529(b), and the now-superseded SSR 96-7p); see also SSR 16-3p, 2016 WL

1119029 at *2; Burgess v. Colvin, 15 Civ. 9585, 2016 WL 7339925 at *11 (S.D.N.Y. Dec. 19, 2016)

(quoting SSR 16-3p for an explanation of the two-step process for assessing claimants' statements

about their symptoms).

In March 2016, the SSA released SSR 16-3p, which provides updated guidance on

evaluating a claimant's claims about the work-preclusive nature of her symptoms.  See generally

SSR 16-3p, 2016 WL 1119029; accord, e.g., Duran v. Colvin, 14 Civ. 8677, 2016 WL 5369481 at

*13 n.27 (S.D.N.Y. Sept. 26, 2016) ("SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2,

1996), and clarifies the policies set forth in the previous SSR.").

The purpose of [SSR 16-3p] is to provide "guidance about how [to] evaluate
statements regarding the intensity, persistence, and limiting effects of symptoms in
disability claims." S.S.R. 16-3P, 2016 WL 1119029, at *1.  The Ruling supersedes
. . . S.S.R. 96-7p, which placed a stronger emphasis on the role of the adjudicator to
make a "finding about the credibility of the individual's statements about the
symptom(s) and its functional effects." S.S.R. 96-7P, 1996 WL 374186, at *1.  In
contrast, S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms,
and "eliminate[s] the use of the term 'credibility'" from sub-regulation policy. S.S.R.
16-3P, 2016 WL 1119029, at *1.  The Commissioner notes that the "regulations do
not use this term," and by abandoning it, "clarif[ies] that subjective symptom
evaluation is not an examination of an individual's character." Id.

Acosta v. Colvin, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).

Vasquez testified that "every day" she hallucinated and had conversations with a "shadow" named "Lolita" that said "negative things." (See page 4 above.)[28/] Vasquez's treatment notes also reflect consistent complaints of auditory and/or visual hallucinations. (See pages 4-14 above.) ALJ Walters found that Vasquez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Vasquez's complaints as to the "intensity, persistence and limiting effects of these symptoms" were "not entirely credible." (See pages 19-20 above.) ALJ Walters noted that Vasquez's reports of auditory hallucinations changed throughout the course of her treatment, there were no hospitalizations, none of her treatment providers expressed any "great alarm," and her treatment notes from Clay Avenue Health Center were "routine with no clinical indication of disabling limitations." (See page 20 above.)

ALJ Walters properly determined that Vasquez's subjective complaints were not supported by her treatment records, specifically her lengthy treatment history at Clay Avenue Health Center that documented no more than moderate mental impairments. (See pages 6-10 above.) Indeed, Vasquez's course of treatment progressed with routine treatment notes that omitted any mention of hallucinations and included increasing GAF scores. (See id.) Thus, while ALJ Walters found that Vasquez had a medically determinable psychiatric impairment, ALJ Walters appropriately found that Vasquez's claims regarding the "intensity, persistence and limiting effects of [her] symptoms" were inconsistent with the record evidence. See, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) ("We have no reason to second-guess the credibility finding in this case where the ALJ identified specific record-based reasons for his ruling."); Rosario v. Astrue, 12 Civ. 3594, 2013 WL 3324299 at *8 (S.D.N.Y. June 25, 2013) ("Here, the ALJ's determination of

---

28/      Vasquez challenges ALJ Walters' credibility determination solely as to her claims of hallucinations. (See Vasquez Br. 10-12.)

plaintiff's credibility is set forth with 'sufficient specificity.' The ALJ acknowledged that plaintiff

complained of auditory hallucinations . . . . The ALJ found, however, that the 'longitudinal evidence

belie[d] the claimaint's credibility with respect to her alleged psychiatric symptoms.'" (record

citations omitted)).

### C. ALJ Walters Properly Considered Vasquez's Physical Impairments

"[A]n impairment is not severe if it has no more than a minimal effect on an

individual's physical or mental ability(ies) to do basic work activities." Med. Impairments That Are

Not Severe, SSR 85-28, 1985 WL 56856 at *3 (S.S.A. 1985); accord, e.g., Ames v. Berryhill, No.

16-CV-316, 2017 WL 1276706 at *3 (W.D.N.Y. Apr. 6, 2017); Sappah v. Colvin, No. 15-CV-1090,

2017 WL 1194235 at *7 (N.D.N.Y. Mar. 30, 2017) ("[A] finding of not severe should be made if

the medical evidence establishes only a slight abnormality which would have no more than a

minimal effect on an individual's ability to work." (quotations omitted)); 20 C.F.R. § 404.1520(c)

(severe impairments are "any impairment or combination of impairments which significantly limits

your physical or mental ability to do basic work activities"). "[T]he mere presence of a disease or

impairment, or establishing that a person has been diagnosed or treated for a disease or impairment

is not, by itself, sufficient to render a condition severe." Mayor v. Colvin, 15 Civ. 0344, 2015 WL

9166119 at *14 (S.D.N.Y. Dec. 17, 2015) (Peck, M.J.) (quotations omitted; citing cases).

Regardless of severity, an ALJ must consider all of a claimant's impairments in

determining the appropriate RFC. See, e.g., SSR 96-8P, 1996 WL 374184 at *5 (S.S.A. July 2,

1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all

of an individual's impairments, even those that are not 'severe.'"); 20 C.F.R. § 404.1545(e) ("[W]e

will consider the limiting effects of all your impairment(s), even those that are not severe, in

determining your residual functional capacity."). "Remand is required when the ALJ fails to account

for the claimant's nonsevere impairments when determining his or her RFC." <u>Ames</u> v. <u>Berryhill</u>, 2017 WL 1276706 at *3.

ALJ Walters found that Vasquez's severe impairments included migraines, obesity and asthma. (<u>See</u> page 18 above.) ALJ Walters, however, found no evidence to support Vasquez's claims of radiculopathy and obstructive sleep apnea. (<u>See</u> <u>id.</u>) Although Vasquez "reported right knee pain to a consultative examiner," ALJ Walters wrote that "there is no supporting objective evidence, and . . . the results of a consultative examination indicated mostly normal range of motion and gait." (<u>See</u> <u>id.</u>) Considering her physical impairments, ALJ Walters found that Vasquez could perform light work and was able to "lift and carry ten pounds frequently and twenty pounds occasionally; . . . sit for about six hours of an eight hour workday; . . . stand and/or walk for about six hours of an eight hour workday; she should avoid concentrated exposure to fumes, odors, dusts, smoke, gases, poor ventilation (and so forth); she is limited to occasional climbing of ramps and stairs; she is limited to occasional kneeling, crouching, and crawling." (<u>See</u> page 19 above.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Vasquez argues that she is disabled based on the combination of her physical and mental impairments. (Dkt. No. 13: Vasquez Br. at 14.) Vasquez claims that ALJ Walters erred when she found that Vasquez's radiculopathy, obstructive sleep apnea and knee pain were non-severe impairments. (Vasquez Br. at 15.) Vasquez also argues that, regardless of their severity, ALJ

Walters erred by not considering Vasquez's impairments– radiculopathy, obstructive sleep apnea, knee pain, and urinary stress incontinence– in determining her RFC.  (Vasquez Br. at 15-16.)

**1.    <u>Knee Pain</u>**

With regard to Vasquez's knee pain, ALJ Walters gave considerable weight to Dr. Fkiaras' consultative opinion, stating that Vasquez had "moderate limitation with squatting, kneeling, and crouching, [and] should avoid heavy lifting." (<u>See</u> page 21 above.)  Vasquez reported to Dr. Fkiaras aching right knee pain for the past nine months rated a six out of ten on the pain scale that made it difficult to walk, squat or stand more than 45 minutes.  (<u>See</u> page 15 above.)  Vasquez's right knee flexion was limited to 145 degrees with mild crepitus.  (<u>See</u> page 16 above.)  Dr. Fkiaras observed that Vasquez was not in acute distress, had a normal gait and stance, could walk on her heels and toes and rise from her chair without difficulty, used no assistive devices, and needed no help changing or getting on and off the exam table.  (<u>See</u> <u>id.</u>)

Substantial evidence supports a determination that Vasquez's knee pain was not "severe."  On September 13, 2012, Vasquez's physical examination with Dr. Robert Balthazar revealed "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection," and full range of motion in her knees.  (<u>See</u> <u>id.</u>)  On March 25, 2014, Vasquez saw Dr. Peter Marcus and claimed that she had pain and stiffness in her knees when climbing stairs.  (<u>See</u> page 17 above.)  Dr. Marcus noted Vasquez's degenerative joint disease of the knee, "medial meniscus tenderness and crepitus" in the right knee, and "mild lateral meniscus tenderness" in the left knee.  (<u>See</u> <u>id.</u>)  On April 30, 2014, FEGS physician Deepak Sawlani wrote that Vasquez had two out of ten moderate knee pain that increased with activity.  (<u>See</u> page 15 above.)  No swelling was present in either knee, and Vasquez's musculoskeletal exam was normal aside from joint pain and range of motion.  (<u>See</u> <u>id.</u>)  Vasquez furthermore had no lifting, pushing, pulling, sitting,

reaching, kneeling, squatting, postural or manipulative limitations, despite being limited to one to three hours of standing and walking. (See id.) However, only a week later on May 7, 2014, Vasquez reported arthritis in both knees, but denied difficulty walking, climbing stairs, or performing activities of daily living. (See id.) On September 23, 2014, Vasquez reported stiffness in both knees that made it difficult to use stairs without pain, but took "nothing for [the] pain" and had full range of motion. (See page 17 above.) None of these physicians ever ordered any diagnostic imaging or physical therapy.

Moreover, even if ALJ Walters erred in finding Vasquez's knee pain non-severe at step two, any error would be harmless because ALJ Walters identified other severe impairments and discussed Vasquez's knee pain at subsequent steps of the analysis. See, e.g., Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) ("At step two, the ALJ identified other 'severe impairments,' including [claimant's] 'back problem, migraine headaches, depression, and post traumatic stress disorder,' and therefore proceeded with the subsequent steps. And, in those subsequent steps, the ALJ specifically considered her anxiety and panic attacks. Because these conditions were considered during the subsequent steps, any error was harmless."); Burch v. Comm'r of Soc. Sec., 15 Civ. 9350, 2017 WL 1184294 at *8 n.7 (S.D.N.Y. Mar. 29, 2017) ("[E]ven if the ALJ had erroneously found some of [claimant's] conditions to be non-severe, it would be harmless error, since the ALJ considered all of [claimant's] impairments (both severe and non-severe) in the remainder of the sequential evaluation process."); Killings v. Comm'r of Soc. Sec., 15 Civ. 8092, 2016 WL 4989943 at *8 n.9 (S.D.N.Y. Sept. 16, 2016) ("The failure to address a condition at step two will constitute harmless error, and therefore not warrant remand, if, after identifying other severe impairments, ALJ considers the excluded conditions or symptoms in the subsequent steps and determines that they do not significantly limit the plaintiff's ability to perform basic work."), R.

& R. adopted, 2016 WL 6952342 (S.D.N.Y. Nov. 28, 2016); Smith v. Colvin, No. 12-CV-1665, 2014 WL 98676 at *8 (N.D.N.Y. Jan. 9, 2014) ("[W]hen there are multiple impairments, as in this case, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step 2 may be harmless because the ALJ continued with sequential analysis and did not deny the claim based on the lack of a severe impairment alone.").  Here, ALJ Walters clearly considered Vasquez's knee pain in determining Vasquez's RFC, which limited climbing ramps or stairs, and kneeling.  (R. 19, 22; see page 19 above.)

### 2.  Radiculopathy, Obstructive Sleep Apnea & Stress Incontinence

Although ALJ Walters found Vasquez's radiculopathy and obstructive sleep apnea to be non-severe, and did not mention Vasquez's urinary stress incontinence at all, Vasquez does not argue that these conditions had any meaningful impact on her ability to perform basic work activities.  The medical records Vasquez cites indicate that she reported and/or was diagnosed with radiculopathy, obstructive sleep apnea and urinary stress incontinence at various times; none of the records, however, describes in any detail the severity of these conditions or their impact on Vasquez's ability to function.  (See Dkt. No. 13: Vasquez Br. at 15.)  There was no basis for ALJ Walters to conclude that these impairments were severe.  Moreover, ALJ Walters' RFC limited Vasquez to low stress jobs, accounting for her urinary stress incontinence.  (See R. 19.)  The Court accordingly finds that ALJ Walters' failure to further discuss Vasquez's radiculopathy, obstructive sleep apnea and urinary stress incontinence does not warrant remand.

### 3.  The Combined Physical Impairments

ALJ Walters properly accounted for Vasquez's severe and non-severe physical impairments in determining her RFC, which generally tracks Dr. Fkiaras' consultative opinion.  Dr. Fkiaras wrote that Vasquez had a "moderate limitation squatting, kneeling, and crouching," "should

avoid smoke, dust, and known respiratory irritants secondary to asthma," and "should avoid any heavy lifting." (See page 16 above.) ALJ Walters gave considerable weight to Dr. Fkiaras' opinion that "indicated mostly normal range of motion and gait," and noted Vasquez's sporadic treatment history for physical impairments. (See page 21 above.) ALJ Walters thus found that Vasquez could "lift and carry ten pounds frequently and twenty pounds occasionally; . . . sit for about six hours of an eight hour workday; . . . stand and/or walk for about six hours of an eight hour workday; she should avoid concentrated exposure to fumes, odors, dusts, smoke, gases, poor ventilation (and so forth); she is limited to occasional climbing of ramps and stairs; she is limited to occasional kneeling, crouching, and crawling." (See page 19 above.)

   "It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions." Duran v. Colvin, 14 Civ. 4681, 2015 WL 4476165 at *14 (S.D.N.Y. July 22, 2015) (Peck, M.J.) (citing cases). ALJ Walters was entitled to rely on Dr. Fkiaras' opinion in reaching her RFC determination, which by and large was consistent with the remaining record evidence. (See, e.g., R. 467 (September 13, 2012: normal range of motion, muscle strength and stability in all extremities, normal mobility in spine, full range of motion in hips and knees); R. 517 (May 13, 2013: no motor weakness, intact balance, gait, coordination); R. 597 (March 25, 2014: mild to moderate tenderness and crepitus in knees, unspecified degree of spinal tenderness); R. 439 (May 7, 2014: no difficulty walking or climbing stairs); R. 621-23 (September 23, 2014: complaint of stiffness in knees, but noting that Vasquez took nothing for pain and had full range of motion).) Although Vasquez claims that ALJ Walters did not consider her knee pain, radiculopathy, sleep apnea and urinary stress incontinence, she does not argue that these conditions

had any impact on her functional limitations not already reflected in the RFC.[29] See, e.g., Aguilar

v. Colvin, No. 15CV643, 2017 WL 1199726 at *7 (D. Conn. Mar. 31, 2017) ("In support of her

contention that the ALJ ignored several of her conditions, plaintiff cites only to the diagnoses of

these conditions. . . . As to her gastroesophogeal reflux disease and hiatial hernia, plaintiff refers

the court to record citations documenting the diagnoses of these conditions, but fails to demonstrate

that either of these conditions limit her ability to perform basic work-related activities. Lastly,

plaintiff makes only generalized references to her hip, knee, and joint pain. She does not point to

any evidence that her joint pain causes functional limitations." (citations omitted)).[30]

      Vasquez further argues that despite finding Vasquez's obesity to be a severe

impairment, ALJ Walters erred by failing to consider it in the RFC. (Dkt. No. 13: Vasquez Br. at

16.) The Court finds that Vasquez's obesity was appropriately accounted for because Dr. Fkiaras'

---

[29] As to Vasquez's urinary stress incontinence, ALJ Walters accounted for Vasquez's stress limitations in her hypothetical question to the vocational expert and by limiting Vasquez to work at a normal production pace, i.e., low stress jobs. (R. 70; see page 19 above.)

[30] See also, e.g., Trombley v. Colvin, No. 15-CV-00567, 2016 WL 5394723 at *17 (N.D.N.Y. Sept. 27, 2016) ("Although the ALJ indicated that he had given careful consideration to the entire record in determining Plaintiff's RFC, he did not expressly address Plaintiff's non-severe impairments in his RFC analysis. While the ALJ may not have specifically mentioned non-severe impairments by name in his RFC analysis, the record as a whole shows that he did evaluate those impairments and their possible limiting effects and found those limitations to be non-existent or de minimis, thereby rendering any legal error on his part harmless."); Henriquez v. Colvin, No. 15-CV-2655, 2016 WL 4384720 at *8 (E.D.N.Y. Aug. 15, 2016) ("Plaintiff has not indicated what additional neck-related limitations the ALJ should have found that are not already incorporated into her decision. Accordingly, Plaintiff's argument that the ALJ failed to properly evaluate his neck impairment is without merit."); Sherman v. Comm'r of Soc. Sec., No. 14-CV-0154, 2015 WL 5838454 at *5 (N.D.N.Y. Oct. 7, 2015) ("While the ALJ did not expressly mention [claimant's] non-severe impairments in his Step 4 analysis, this omission would be at most harmless error absent evidence that these impairments contributed to any functional limitations. . . . In her brief, plaintiff identifies nothing in the administrative record showing that her asthma, carpal tunnel syndrome or edema had any effect on plaintiff's residual functional capacity.").

opinion, on which ALJ Walters relied, noted Vasquez's weight and provided a detailed discussion of her overall physical limitations. See, e.g., Drake v. Astrue, 443 F. App'x 653, 657 (2d Cir. 2011) ("[W]e agree with the District Court that the ALJ implicitly factored Drake's obesity into his RFC determination by relying on medical reports that repeatedly noted Drake's obesity and provided an overall assessment of her work-related limitations."); Negron v. Colvin, No. 15-CV-2515, 2017 WL 1194470 at *5 (E.D.N.Y. Mar. 31, 2017) ("'[O]besity is not in and of itself a disability,' and 'an ALJ's failure to explicitly address a claimant's obesity does not warrant remand.'"); Davilar v. Comm'r of Soc. Sec., No. 15-CV-7200, 2017 WL 1232490 at *4 (E.D.N.Y. Mar. 31, 2017) ("Here, there is no evidence that the ALJ explicitly considered how Plaintiff's obesity may have affected her ability to engage in work-related activities. However, this is not an error of law. By considering the physical limitations established by Plaintiff's treating and consultative physicians, the ALJ effectively addressed the extent to which Plaintiff's obesity affected her ability to perform work-related activities."). As with Vasquez's knee pain, radiculopathy, sleep apnea and stress incontinence, Vasquez does not suggest that her obesity causes any additional functional impairments not accounted for in the RFC. See, e.g., Browne v. Comm'r of Soc. Sec., 131 F. Supp. 3d 89, 102 (S.D.N.Y. 2015) ("Browne provides no explanation as to how a proper consideration of his obesity would indicate a lack of substantial evidence for the ALJ's determination.").

The Court finds that ALJ Walters accounted for Vasquez's severe and non-severe impairments, and her RFC determination was supported by substantial evidence. Cf. McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014) ("[T]he Step Four residual functional capacity finding did not explicitly include [claimant's] non-exertional functional limitations. However, Step Four findings need only 'afford[ ] an adequate basis for meaningful judicial review, appl[y] the proper

legal standards, and [be] supported by substantial evidence such that additional analysis would be unnecessary or superfluous.'").

> **D.     The ALJ Did Not Fail To Develop The Record**

Vasquez argues that "since ALJ Walters had unresolved concerns about the severity of plaintiff's [mental] impairment, including the effect of her hallucinations, ALJ Walters erred in not developing the record and reconnecting with the treating psychiatric health care providers for clarification." (Dkt. No. 13: Vasquez Br. at 12.)

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record:

> "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."   Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial."   "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits."

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009) (citations omitted).  The Second Circuit has clarified, however, that "'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a "complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'"  Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (quoting Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996))).[31]

---

[31]     See also, e.g., Ramos v. Comm'r of Soc. Sec., 13 Civ. 6561, 2015 WL 708546 at *18 (S.D.N.Y. Feb. 4, 2015) (ALJ had no further obligation to develop the record where the medical record from the treating clinic was "extensive, including more than two years of consistent treatment notes."); Matos v. Colvin, 13 Civ. 4525, 2014 WL 3746501 at *9 (S.D.N.Y. July 30, 2014) (ALJ properly fulfilled duty to develop the record where he questioned claimant thoroughly, solicited testimony from medical and vocational experts and
(continued...)

The record before ALJ Walters contained multiple medical providers' opinions regarding Vasquez's psychiatric impairments, spanning over two years of regular treatment.  (See pages 4-14 above.)  When asked at the hearing whether he "consider[ed] the record complete," Vasquez's attorney responded that it was.  (R. 45.)  Nothing suggests that ALJ Walters had any "unresolved concerns" about Vasquez's mental impairments; rather, she simply rejected the claimed severity of those impairments based on the record evidence.  The Court concludes that ALJ Walters made her determination in reliance on a record containing a complete medical history with no obvious gaps, and therefore had no obligation to further develop the administrative record in the manner Vasquez suggests.

As to physical impairments, Vasquez argues that "[t]o the extent that ALJ Walters needed clarification of [Vasquez's radiculopathy, obstructive sleep apnea, thyroid disorder, knee pain or urinary stress incontinence claims], she had a duty to reconnect with the treating physician or other health care providers and develop the record."  (Vasquez Br. at 15.)  But, as already discussed, there is no evidence that these conditions had any significant impact on Vasquez's ability to perform basic work functions, and Vasquez (who was represented by counsel before the ALJ and in this case) makes no such argument.  Thus, as with Vasquez's mental impairments, ALJ Walters needed no "clarification" on the impact of the conditions.  See, e.g., Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Plaintiff suggests that the ALJ failed adequately to develop the record concerning the possibility that plaintiff was mentally disabled.  However, we find little indication in the record suggesting a disabling mental disorder during the period in question that would have obliged the ALJ to develop the record further."); Miller v. Colvin, No. 15-CV-0552, 2016 WL

---

[31/]    (...continued)
admitted voluminous submissions from physicians.), aff'd, 618 F. App'x 14 (2d Cir. 2015).

4402035 at *7-8 (N.D.N.Y. Aug. 18, 2016) ("[A]lthough Plaintiff argues that the ALJ should have sought additional information regarding her diagnosis [of fibromyalgia], she fails to articulate what this evidence consists of and whether it was missing from the record. . . . Furthermore, Plaintiff has failed to show that, had the ALJ found her fibromyalgia to be a medically determinable impairment, he would have found additional limitations on her ability to work."); Santiago v. Astrue, No. 10-CV-937, 2011 WL 4460206 at *2 (D. Conn. Sept. 27, 2011) ("The plaintiff makes only a general argument that any missing records possibly could be significant, if they even exist. That argument is insufficient to carry his burden.").

       Nor, as Vasquez alternatively argues, was ALJ Walters required to send Vasquez "for an updated consultative examination since [Vasquez's] diagnosis of sleep apnea and urinary stress incontinence did not appear in [her] medical records until after Dr. Fkiaras' November 8, 2013 consultative examination." (Vasquez Br. at 15.) "It can be reversible error for an ALJ not to order a consultative examination when an examination is required for an informed decision. However, an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it." Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 32 (2d Cir. 2013) (citation omitted). Here, "[t]he record does not suggest any further limitation that would necessitate a consultative . . . examination" as to these two conditions that Vasquez does not claim cause her any additional functional limitations. Id.; see also, e.g., Serianni v. Astrue, No. 07-CV-250, 2010 WL 786305 at *6 (N.D.N.Y. Mar. 1, 2010) ("There is no evidence that plaintiff's depression and/or anxiety affected her ability to function appropriately or independently. The ALJ was not obligated to send plaintiff, who was represented by counsel, for a consultative examination when the facts did not warrant such an examination.").

**CONCLUSION**

For the reasons discussed above, Vasquez's motion for judgment on the pleadings

(Dkt. No. 12) is <u>DENIED</u>, and the Commissioner's motion (Dkt. No. 14) is <u>GRANTED</u>.

SO ORDERED.

Dated:      New York, New York
            May 1, 2017

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:        All Counsel